# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

## *Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CLAYTON ROSENBERG,<br>*Also known as "Kenneth Clayton,"*<br>*Also known as "Kobe,"*<br><br>Defendant. | Case No. 1:24-cr-61<br><br>Count 1: 18 U.S.C. § 1349<br>(Conspiracy to Commit Wire Fraud and Bank Fraud)<br><br>Forfeiture Allegation |

## CRIMNAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### COUNT 1

### (Conspiracy)

### Introductory Allegations

At all times relevant to this Information:

1. Defendant CLAYTON A. ROSENBERG ("the defendant" or "ROSENBERG") resided and worked in Washington, D.C., among other places.

2. The defendant also went by other names, including "Kobe" and "Kenneth Clayton."

3. ROSENBERG controlled various shell companies, including but not limited to, BERG CTST LLC, and Rosenberg Cares LLC. These shell companies were inactive companies that were used as vehicles for fraudulent financial transactions.

4. Bank A was headquartered in New Jersey. Bank A was insured by the FDIC and was a financial institution as defined by 18 U.S.C. § 20. Bank A was the bank that initially

funded many of the fraudulent PPP loans that the defendant and his coconspirators applied for and received.

### *The CARES Act and PPP*

5. The SBA was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

6. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. Bank A participated in the PPP as a lender, and, as such, was authorized to lend funds to eligible borrowers under the terms of the PPP. These loans had government backed guarantees. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

7. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or about April 2020, Congress authorized over $300 billion in additional PPP funding.

8. The PPP allowed qualifying small businesses and other organizations to receive PPP loans. As part of the program requirements, businesses had to use PPP loan proceeds for certain permissible expenses – payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loans to be entirely forgiven if the business spent

the loan proceeds on these expense items within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

9. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications. In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used by the lender to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses. The supporting documentation often included bank account records and IRS tax forms, including Schedule C forms. The lenders relied on the accuracy of the information contained in the PPP applications and supporting documents.

10. The SBA oversaw the PPP. However, individual PPP loans were issued by private, approved lenders who received and processed PPP applications and the supporting documentation, and then made loans using the lenders' own funds, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender, or by a partner on the lender's behalf, via wire to the SBA in the course of processing the loan. The SBA received all PPP loan applications submitted after January 11, 2021, from lenders through servers in Oregon. This server performed an initial screening on the loan applications and then sent the loan details to E-Tran for additional screening of the loan applications. The SBA then used the E-Tran server located in Sterling, Virginia, within the Eastern District of Virginia, to

process the applicant's data electronically to determine if a loan should be authorized. Similarly, after its review, the SBA used the E-Tran computer server located in Sterling, Virginia to notify the lenders, or a partner on the lender's behalf, electronically if a loan should be funded.

11. The PPP loan application posed a number of questions and required the applicant to make a number of certifications including that the business was in operation as of February 15, 2020, that the PPP loan would be used to pay payroll, mortgage payments, lease payments, and utility payments as required by the PPP rules, and that all information in the application supporting document was true and accurate.

## The Conspiracy and Its Objects

12. From at least in or around June 2020 through at least in or about June 1, 2021, in the Eastern District of Virginia and elsewhere, the defendant,

**CLAYTON A. ROSENBERG**

did unlawfully and knowingly combine, conspire, and agree with others both known and unknown to commit the following offenses against the United States, all in violation of 18 U.S.C. § 1349:

    a. Wire Fraud — that is, knowingly to devise and intend to devise a scheme and artifice to defraud financial institutions, lenders, and home owners, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

4

  b. Bank Fraud — that is, to knowingly devise and intend to devise a scheme and artifice to defraud financial institutions, and to obtain and attempt to obtain by means of materially false and fraudulent pretenses, representations, and promises, moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of a financial institution, in violation of Title 18, United States Code, Section 1344.

13. It was the purpose the conspiracy for ROSENBERG and his coconspirators to enrich themselves by fraudulent obtaining and attempting to obtain PPP loans for businesses that were not entitled these PPP loans. ROSENBERG and his coconspirators obtained and tried to obtain fees, often a percentage of the fraudulent PPP loan proceeds, from the individuals and business owners for whom they obtained PPP loans for by preparing the PPP loan applications.

### *Ways, Manner, and Means of the Conspiracy*

14. To achieve the purpose of the conspiracy and its unlawful objects, the defendant and his coconspirators engaged in the following conduct within the Eastern District of Virginia and elsewhere:

15. The defendant and his coconspirators would recruit others, including business owners, to have PPP loan applications prepared in their names and in their companies' names. Coconspirator-2 would often reach out to several of the businesses about potential PPP loans. Coconspirator-2 would then connect these business owners or representatives to ROSENBERG.

16. ROSENBERG and his coconspirators would then prepare, cause to be prepared, and assist in the preparation of the fraudulent PPP loan applications. These applications included false information about the companies, including materially inflating each business's number of employees and monthly expenses. The defendant and his coconspirators would also falsify each

business's quarterly and annual payroll expenses, and annual revenues. This false information was included in the loan applications to increase the amount of PPP funds that the companies, ROSENBERG, and his coconspirators were able to receive.

17. The defendant and his coconspirators would also prepare, cause to be prepared, assist in the preparation of, submit, assist in the submission of, and cause to be submitted, falsified IRS forms, including Schedule C forms that falsely represented that each business had generated a certain amount of gross income (when in fact the business had not generated that amount of income) and fabricated bank statements in support of each PPP application.

18. Knowing that the PPP loan proceeds, including the percentage paid to the defendant and his coconspirators, would be used for purposes unrelated to the specified authorized expenses of the PPP loans, the defendant and his coconspirators would falsely certify and caused to be certified on each PPP loan application that the funds would be used to retain workers and maintain payroll or mark mortgage interest payments, lease payments, and utility payments.

19. Knowing that the applications and the IRS forms included false information, the defendant, and his coconspirators falsely certified and caused to be certified on each PPP loan application that the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects.

20. The coconspirators would electronically sign and submit, assist in the submission of, and caused to be submitted, the false PPP loan applications over the Internet.

21. The defendant and his coconspirators' submission of the fraudulent PPP loan applications caused interstate wire transmissions. The defendant and his coconspirators submitted multiple fraudulent loan applications to Bank A, which used a server located in Pennsylvania. Bank A then forwarded the loan applications to the SBA, which used servers located in the Eastern

District of Virginia to receive the loan applications.

22. After Bank A and other financial institutions approved and funded the fraudulent PPP loans, the defendant and his coconspirators would collect a percentage from the businesses and individuals who received the PPP loans. Often, the businesses and individuals who received the loans would transfer the defendant and his coconspirators' percentage of the PPP proceeds to the shell companies controlled by ROSENBERG and his coconspirators. After the PPP funds reached the shell companies, the defendant and his coconspirators would divide the fraud proceeds amongst themselves.

23. ROSENBERG and his coconspirators knowingly prepared and submitted, assisted in the preparation and submission of, and caused to be prepared and submitted, at least 16 fraudulent PPP loan applications during the conspiracy. In total, the defendant and his coconspirators caused an actual loss of at least $9,364,894.

(All in violation of Title 18, United States Code, Sections 1349.)

## FORFEITURE NOTICE

Pursuant to Federal Rule of Criminal Procedure 32.2(a), Defendant CLAYTON ROSENBERG is hereby notified that, if convicted of wire fraud as alleged in Count 1 of this Information, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of the violation in Count One. If any property that is subject to forfeiture is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e). The property subject to forfeiture includes but is not limited to the following: a sum of money equal to at least $1,666,290 in United States currency, representing the amount of proceeds obtained as a result of the offense in Count One.

(In accordance with Title 18, United States Code, Section 982(a)(2)(A); and Rule 32.2(a), Federal Rules of Criminal Procedure.)

Jessica D. Aber
United States Attorney

By: _____
Kathleen E. Robeson
Assistant United States Attorney