

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

UNITED STATES OF AMERICA

v.

CLAYTON ROSENBERG,
   *Also known as "Kenneth Clayton,"*
   *Also known as "Kobe,"*

   Defendant.

Case No. 1:24-cr-61

STATEMENT OF FACTS

1. The United States and the defendant, CLAYTON ROSENBERG (hereinafter, "defendant" or "Rosenberg"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

2. As background, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance expeditiously to millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses through a program referred to as the Paycheck Protection Program ("PPP"). The recipients of the PPP loans were supposed to use the loans on permissible business expenses, such as making payroll payments.

3. Several federal programs also expanded unemployment insurance eligibility and increased unemployment benefits during the pandemic. The purpose of the expanded unemployment insurance ("UI") benefits was to assist those who lost their jobs through no-fault of their own and that pandemic unemployment benefits ("pandemic benefits") were to assist individuals whose employment, or self-employment, was negatively impacted by COVID-19.

1



4. The defendant went by other names including, "Kobe," or "Kenneth Clayton."

5. From at least June 2020 through at least June 1, 2021, the defendant resided and worked in Washington, D.C., among other places.

6. During this time, the defendant also controlled various shell companies, including BERG CTST LLC, and Rosenberg Cares LLC. One of Rosenberg's conspirators, Coconspirator-1, controlled the shell company WW Logistics, LLC. These shell companies were inactive companies that were used as vehicles for fraudulent financial transactions.

7. Bank A was headquartered in New Jersey. Bank A was insured by the FDIC and was a financial institution as defined by 18 U.S.C. § 20. Bank A was the bank that initially funded many of the fraudulent PPP loans that the defendant and his coconspirators fraudulently applied for and received.

### PPP Loan Fraud Scheme

8. From at least in or around June 2020 through at least in or about June 2021, the defendant conspired with Coconspirator-1, Coconspirator-2, and others to commit wire fraud and bank fraud. Specifically, the defendant agreed with Coconspirator-1, Coconspirator-2, and others to submit materially false applications for PPP funded loans and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice to defraud, in violation of 18 U.S.C. § 1349.

9. The defendant knew that an object of the conspiracy was for him and his coconspirators to enrich themselves by obtaining PPP loan funds for various businesses even though these businesses were not entitled to receive PPP loans. Another purpose of the conspiracy was for the defendant and his coconspirators to obtain fees in connection with the fraudulent loan

2



submissions. Specifically, the defendant charged the individuals or the business owners who received the fraudulent PPP loans a fee for preparing the PPP loan application.

10. The defendant and his coconspirators prepared at least 16 fraudulent PPP loan applications that had materially false misrepresentations. While the defendant did not submit every application, he assisted others in their submission of the applications. The defendant and his coconspirators submitted false applications for at least 16 businesses or purported businesses that were funded by Bank A and the SBA. Bank A paid out over $1,000,000 in fraudulent PPP loans as a result of the defendant's scheme.

11. Some of the businesses that the defendant and his coconspirators prepared the fraudulent PPP loan applications for were located within the Eastern District of Virginia. For example, Company-9 and Company-10 were located within the Eastern District of Virginia.

12. The defendant and his coconspirators prepared fraudulent PPP loan applications for the businesses that claimed grossly inflated number of employees and artificially high monthly payroll costs. As part of their intake process, defendant and his coconspirators requested the business owners to complete forms or "PPP Intake Sheets" sharing their bank account information, EIN numbers, the business owners or "client's" date of birth, Social Security number, and other personally identifying information. Notably, the defendant and his coconspirators never asked the business owners to provide the actual number of employees the business employed. Instead, the defendant and his coconspirators simply made-up numbers of employees to use for the loan applications. The defendant and his coconspirators also created false tax returns and fake bank statements that were submitted in support of the fraudulent PPP loan applications.

13. After the financial institutions, including Bank A, funded and approved the loan applications, the business owners would share the loan proceeds with Rosenberg and his

3



coconspirators. Often the business owners would transfer a percentage of the PPP loan proceeds to bank accounts held by shell companies, that were controlled by the defendant and his coconspirators. The conspirators then split the fraud proceeds amongst themselves.

14. For example, Company-1 received a PPP loan of $345,780 from Bank A on or about March 18, 2021. In Company-1's PPP loan application, the defendant falsely stated that Company-1 employed 20 people and paid over $100,000 per month in payroll. This was not true, Company-1 only employed one person. Company-1's owner transferred $87,000 to a bank account held by WW Logistics LLC around March 18, 2021. The $87,000 was divided among the coconspirators and Rosenberg received approximately $37,874 from Company-1's PPP proceeds.

15. The defendant and his coconspirators also applied for a PPP loan for Company-2, another small business. The defendant submitted a PPP loan application to Bank A that falsely stated that Company-2 employed over 60 individuals even though Company-2 actually employed only five individuals. On or about March 17, 2021, Company-2 received $380,730 in a PPP loan proceeds. Shortly after receiving the loan proceeds, a Company-2's representative transferred $68,000 to Rosenberg Cares LLC and $8,000 to BERG CTST. The defendant then divided that $76,000 he received in fraudulent proceeds among himself and the coconspirators. The defendant ultimately received approximately $64,000 of Company-2's PPP proceeds.

16. Company-3 also received a fraudulent PPP loan payout of approximately $1,200,000 from Bank A on or about March 17, 2021. The defendant and his coconspirators previously submitted a fraudulent PPP loan application on behalf of Company-3. Again, the defendant and his coconspirators grossly inflated the number of Company-3's employees on its PPP loan application, and falsely claimed that it employed 40 people. Company-3's owner transferred $420,000 to Rosenberg Care LLC the day after Company-3 received the PPP loan.

4



17. Other fraudulent PPP loans that the defendant and his coconspirators helped businesses receive, alongside the money that the defendant received from each fraudulent PPP loan are listed below.

| Company | Approximate Amount of PPP Loan Proceeds | Defendant's Cut |
|---|---|---|
| Company-1 | $345,780 | $37,874 |
| Company-2 | $380,730 | $64,000 |
| Company-3 | $1,200,672 | $420,000 |
| Company-4 | $249,917 | $99,466 |
| Company-5 | $595,820 | $203,000 |
| Company-6 | $395,865 | - |
| Company-7 | $547,200 | $82,000 |
| Company-8 | $525,000 | $157,500 |
| Company-9 | $604,166 | $139,520 |
| Company-10 | $645,833 | $200,000 |
| Company-11 | $875,000 | $218,750 |
| Company-12 | $825,000 | - |
| Company-13 | $867,111 | $31,000 |
| Company-14 | $739,000 | - |
| Company-15 | $547,000 | $13,180 |
| Company-16 | $20,800 | - |
| Total | $9,364,894 | $1,666,290 |

5



18. The parties agree that the payout of these fraudulent PPP loans and the wire fraud conspiracy caused a total loss of at least $9.3 million. The defendant received at least $1,666,290 of these fraud proceeds.

**Other Conduct**

19. The defendant also worked with some of his coconspirators, including Coconspirator-2, to obtain other pandemic relief funds by submitting false and fraudulent UI and pandemic benefit applications with the Maryland Department of Labor and other state agencies, (referred to as state workforce agencies "SWA") that administer UI for different states. The defendant and his coconspirators obtained individuals' personal identifying information ("PII") and used that information to make fraudulent UI and pandemic claims. The defendant and his coconspirators obtained this PII by buying "profiles" of individuals' PII from the Internet. The defendant knew that the fraudulent UI and pandemic claims would cause the Maryland Department to send the UI and pandemic benefits on prepaid debit cards mailed to the addresses that the conspirators listed on the applications. Specifically, as a result of the claims, the Maryland Department of Labor would send, via US mail, the benefits on prepaid debit cards. Future claims, which were made through weekly certifications, were then paid on the prepaid cards.

20. The defendant and his coconspirators also fraudulently obtained UI funds from other states, including California and New York. The defendant and his coconspirators attempted to fraudulently obtain UI funds from Hawaii and North Carolina but were unable to obtain any UI and pandemic benefits from those states.

21. Along with individuals' PII, such as names and social security numbers, the defendant and his conspirators included materially false information in the applications and certifications. Among other such information, conspirators provided false employment and wage

6



history, as well as false contact information, including addresses, email addresses, and phone numbers.

22. The defendant and his conspirators falsely certified the truth and accuracy of all information included in the UI and pandemic benefit applications, as well as the purported claimants' eligibility to receive those benefits, when—in truth and fact, as the defendant and his conspirators then and there well knew—such information was not true and accurate and neither the defendant, his conspirators nor the individuals identified as claimants were then eligible to receive the benefits sought through these applications.

23. Once the Maryland Department of Labor, or other targeted SWAs, authorized UI and pandemic benefits in connection with a false and fraudulent applications, in order to continue to receive such benefits, the defendant and his conspirators continued to file claims by submitting false weekly certifications that the purported claimant remained eligible to receive those benefits.

24. The defendant applied for and received over $110,308 in UI and pandemic assistance benefits from the Maryland, California, and New York SWAs. Specifically, Rosenberg received approximately $46,360 in UI and pandemic assistance benefits from Maryland, $61,050 from California and $2,898 from New York.

25. The defendant withdrew and spent some of the fraudulent UI and pandemic assistance benefits he received in Fairfax, Virginia. Specifically, the defendant withdrew funds from one of the prepaid debit cards that contained the Maryland UI and pandemic assistance benefits at an ATM in Bailey's Cross, Virginia on or about September 15, 2020.

26. The defendant also possessed device-making equipment in his D.C. residence. Specifically, the defendant possessed the equipment to create fraudulent documents, black check paper, card stock for IDs, holograms that were used for passports and drivers' licenses, at least six

7



fraudulent Social Security cards and at least eight fake driver's licenses at his residence. The defendant also made at least two fake Burkina Faso passports and at least one unauthorized United States passport.

27. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

28. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: 3/20/24

By: _____
Kathleen Robeson
Assistant United States Attorney

8

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, CLAYTON ROSENBERG, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
CLAYTON ROSENBERG

I am Clayton Rosenberg's defense attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Robert Feitel, Esq.
Attorney for CLAYTON ROSENBERG

3/15/24

9