IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:24-cr-61 |
| | ) | |
| v. | ) | Sentencing Date: August 2, 2024 |
| | ) | |
| CLAYTON ROSENBERG, | ) | The Honorable Claude M. Hilton |
| | ) | |
| *Defendant*. | ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The defendant, Clayton Rosenberg, chose to take advantage of a global pandemic to enrich himself by conspiring with others to file fraudulent Paycheck Protection Program ("PPP") loan applications and collect Unemployment Insurance ("UI") benefits to which he was not entitled, resulting in a loss of at least $9.4 million dollars. The United States of America, through undersigned counsel, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), files its sentencing recommendation.

The Presentence Investigation Report ("PSR") calculated Rosenberg's total offense level as 26 and his criminal history as category I, which translates to an advisory Guidelines range of 63–78 months. The United States agrees with the PSR's Guideline calculations. For the reasons set forth below, the United States respectfully requests that the defendant be sentenced to a term of imprisonment of 63 months, which is at the low end of the Guidelines.

**I.     BACKGROUND**

   **A. The Pandemic**

The early months of the COVID-19 pandemic were characterized not only by a serious death and disease, but also by financial panic and fear of a looming economic depression. Millions of Americans lost their jobs seemingly overnight as businesses closed and governments issued

stay-at-home orders.[1]

In response to the looming financial peril threatening the country, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, more commonly known as the "CARES Act," in March of 2020. The CARES Act made billions of government-guaranteed loans available to qualified small businesses through the Paycheck Protection Program. These loans would be forgiven entirely if the loan proceeds were used on a narrow list of expenses designed to help struggling businesses survive such as payroll, utilities, rent, and employee health care expenses. PSR ¶ 16. To qualify for a PPP loan, an applicant had to meet certain criteria designed to ensure that the program's assets would be used to forestall widespread layoffs and economic collapse. The CARES Act also granted additional funding to State Workforce Agencies ("SWAs") that oversee distribution and eligibility for UI benefits.

**B. Offense Conduct**

From at least June 2020 through at least June 2021, Rosenberg and his coconspirators, sought out businesses they could use to exploit the Paycheck Protection Program. PSR ¶¶ 24–25, 28. Rosenberg and his coconspirators understood that by falsely inflating the number of employees and payroll costs for each business, they could receive larger PPP loans. *See* PSR ¶ 28. Rosenberg and his coconspirators created fake tax documents and bank statements to support the fraudulent loan applications. PSR ¶ 25. And once the PPP loans were disbursed, Rosenberg and his coconspirators charged the businesses large fees. PSR ¶ 30–32, 33. In total, Rosenberg and his

---

[1] 23.1 million Americans were unemployed in April 2020. "TED: Economics Daily," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/opub/ted/2020/unemployment-rate-rises-to-record-high-14-point-7-percent-in-april-2020.htm (last visited September 1, 2023).

coconspirators knowingly prepared at least 16 fraudulent PPP loan applications, resulting in a loss of over 9.3 million dollars. Of the 9.3 million, the defendant received at least $1.6 million (roughly 18% of the total loss).

Rosenberg also engaged in UI fraud. Rosenberg and his co-conspirators fraudulently obtained UI funds from Maryland, California, and New York. PSR ¶ 40. Rosenberg and his co-conspirators also attempted to fraudulently obtain UI funds from Hawaii and North Carolina. PSR ¶ 36. Rosenberg conspired to obtain individuals' personally identifiable information ("PII"), such as names and social security numbers. Rosenberg and his co-conspirators then used false information (false employment and wage history, fake addresses, fraudulent certifications, etc.) to apply and receive UI benefits in the names of other people. PSR ¶ 38. In total, Rosenberg applied for and received over $110,308 in UI benefits from Maryland, California, and New York, to which he was not entitled. PSR ¶ 40.

## II. GUIDELINES CALCULATION

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, it held that a sentencing court must "consult [the] Guidelines and take them into account when sentencing." 543 U.S. 200, 264 (2005); *see also United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006). Indeed, the Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (internal quotation marks omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

3

A sentencing court should first calculate the defendant's guideline range after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the [G]uidelines and those factors set forth in [18 U.S.C. §] 3553(a) before imposing the sentence." *Id.*

   a. The Advisory Guideline Range

The parties agree to the base offense level, the 18-level enhancement based on actual loss, and the 2-level enhancement for deriving more than $1,000,000 from a financial institution are not in contention. PSR ¶ 2, ECF No. 10 at 3.

| Guidelines | Description | Offense Level |
|---|---|---|
| 2B1.1(a)(1) | Base Offense Level | 7 |
| 2B1.1(b)(1)(J) | Actual loss greater than $3,500,000 but less than $9,500,000 | +18 |
| 2B1.1(b)(17) | Deriving more than $1,000,000 in gross receipts from a financial institution | +2 |

The PSR offense level calculation includes two additional enhancements: (i) a 2-level enhancement because the offense involved sophisticated means, *see* PSR ¶ 55, U.S.S.G. § 2B1.1(b)(10)(C); and (ii) a 2-level enhancement because the offense involved the use of device-making equipment or authentication features, *see* PSR ¶ 56, U.S.S.G. § 2B1.1(b)(11)(A). The plea agreement explicitly reserves the right for the parties to argue their position regarding sophisticated means enhancement. ECF No. 10 at 3. The plea agreement does not explicitly mention a device-making/authentication-feature enhancement.

4

i. <u>Sophisticated Means Enhancement</u>

The PSR correctly includes a 2-level enhancement for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10)(C). "For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. 2B1.1 cmt. n.9(B); *see also Stinson v. United States*, 508 U.S. 36, 38, 113 (1993) (holding that Guidelines commentary explaining or interpreting a rule "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline").

In this case, Rosenberg pleaded guilty to the specific example of sophisticated means envisioned by the United States Sentencing Commission—hiding assets and transactions through shell companies. The Statement of Facts specifies that Rosenberg and his co-conspirator "controlled various shell companies," which they used "as vehicles for fraudulent financial transactions." ECF No. 11 at 2. Rosenberg stipulated in writing that the "Statement of Facts is true and accurate." *Id.* At 9. Accordingly, Rosenberg's own words (in addition to his actions) demonstrate that the sophisticated means enhancement is properly applied. Furthermore, just months ago, this Court found that the sophisticated means enhancement applied to Rosenberg's co-conspirator, Wendinboude Ouedraogo. *See U.S. v. Wendinboude Ouedraogo*, 1:23-cr-183. Ouedraogo's Statement of Facts contains virtually identical language about the use of shell companies, *see U.S. v. Ouedraogo*, 1:23-cr-183, ECF No. 9 at 5. So too is the sophisticated means enhancement applicable here.

The defendant objects to the sophisticated means enhancement arguing that the use of shell companies "was a relatively minor part of the offense." PSR at 28. Not so. The use of shell companies was integral to the conspiracy because the shell companies were the means through which Rosenberg and his co-conspirators: (1) received their "fees" for submitting the fraudulent loans; (2) concealed the source of the proceeds; and (3) divided the proceeds among the co-conspirators. *See* ECF No. 11 at 14–16 (describing three different companies transferring over $500,000 in illegally obtained PPP loan proceeds to shell companies controlled by Rosenberg and his co-conspirator, then disbursing the fraud proceeds from the shell companies to the co-conspirators). *See also United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) ("[A] defendant need not utilize the most complex means possible to conceal his fraudulent . . . [t]he court need only find the presence of efforts at concealment that go beyond (not necessarily far beyond) the concealment inherent in [the underlying] fraud." (internation citations and alterations omitted)). Accordingly, the sophisticated means enhancement is properly applied to Rosenberg.

ii. Device-making Equipment/Authentication Feature Enhancement

The PSR also correctly includes a 2-level enhancement for the use of device-making equipment/authentication features pursuant to U.S.S.G. § 2B1.1(b)(11)(A).

Device making equipment for purposes of U.S.S.G. § 2B1.1(b)(11)(A) is defined as "any equipment, mechanism, or impression designed or primarily used for making an access device[2] or

---

[2] "[T]he term 'access device' means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument)." 18 U.S.C. § 1029(e)(1).

6

a counterfeit access device." 18 U.S.C. § 1029(e)(9); U.S.S.G. 2B1.1 cmt. n.10(A) (referencing 18 U.S.C. § 1029(e)(9) for the definition of device making equipment).

An authentication feature for purposes of U.S.S.G. § 2B1.1(b)(11)(A) is defined as" any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified." 18 U.S.C. § 1028(d)(1); U.S.S.G. 2B1.1 cmt. n.10(A) (referencing 18 U.S.C. § 1028(d)(1) for the definition of authentication feature).

The Statement of Facts specifies that Rosenberg possessed "device-making equipment," such as "the equipment to create fraudulent documents, black [sic] check paper, card stock for IDs, [and] holograms that were used for passports and drivers' licenses." PSR ¶ 26. Rosenberg also possessed "at least six fraudulent Social Security cards and at least eight fake driver's licenses" and made "at least two fake Burkina Faso passports and at least one unauthorized United States passport." *Id.* The defendant admits to possessing these materials. ECF No. 11 at 7, 9. And there is no doubt that the equipment meets the definition of device-making equipment and authentication features for purposes of U.S.S.G. § 2B1.1(b)(11)(A).

Nevertheless, the defendant argues that the device-making/authentication feature enhancement is improper because "device making equipment was not used in furtherance of the scheme to commit PPP fraud." PSR at 29. The defendant is incorrect for two reasons. First, the enhancement is based on the "possession *or* use" of device-making equipment/authentication features. U.S.S.G. § 2B1.1(b)(11)(A) (emphasis added). Therefore, mere possession is sufficient

7

for the enhancement to apply. Second, defendant pleaded guilty to a conspiracy involving two schemes to defraud, both schemes involved the *use* of device-making equipment or authentication features. The Statement of Facts outlines two schemes to defraud—a PPP loan fraud scheme and a UI fraud scheme. In furtherance of the PPP loan fraud scheme the defendant and is co-conspirators created false tax returns and fake bank statements. ECF No. 11 at 3. Therefore, the device making equipment/authentication features, such as the blank check paper found in the defendant's home, *see* PSR ¶ 26, would have assisted with the PPP loan fraud. And the materials such as the fake Social Security cards and driver's licenses would have assisted with carrying out the UI fraud. *See* PSR ¶ 21 ("Along with individuals' PII, such as names and social security numbers, the defendant and his conspirators included materially false information in the applications and certifications.").

For those reasons the two-level enhancement for sophisticated means and the two-level enhancement for device-making equipment/authentication features are appropriate in this case. And the defendant's correct total offense level is 26 (after Zero-Point Offender and Acceptance of Responsibility deductions). *See* PSR ¶¶61–65.

## III. THE FACTORS SET FORTH IN SECTION 3553(A) AND RECOMMENDED SENTENCE

After calculating the appropriate Guidelines range, the court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006), *overruled on other grounds*. Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of

8

the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61. The advisory guidelines range is an important starting point because it captures the seriousness of the offense. *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007) ("[T]he Guidelines reflect a carefully considered assessment of the seriousness of federal crimes").

### A. The Nature, Circumstances, and Seriousness of the Offense

During a time of unprecedented uncertainty when millions of Americans were struggling, Rosenberg and his co-conspirators worked to defraud two different pandemic relief programs. The defendant committed a serious crime and helped cause over $9 million in losses to the Paycheck Protection Program. Standing alone, the $9 million dollar loss and the defendant's unlawful $1.6 million dollar gain from the fraud is significant. But that was not enough for the defendant. He also fraudulently obtained over $110,308 in UI benefits from three different states. PSR ¶ 40, 46. In 2023, the average American earned approximately $59,428 and the average Virginian earned $65,590.[3] This Court should sentence the defendant to a meaningful term of incarceration to show that these financial crimes do not pay.

However, the harm in this case cannot be measured solely by the financial losses suffered by the victim. Rather, the defendant's criminal conduct imposed several other harms on secondary

---

[3] "Average Salary by State (in 2023)," by Belle Wong, Forbes Advisor, available at https://www.forbes.com/advisor/business/average-salary-by-state/#sources_section (last visited August 18, 2023) (citing statistics from the U.S. Bureau of Labor Statistics).

9

victims, including:

    a. By unjustly obtaining the proceeds of 16 PPP loans, the defendant stole opportunities from at least 16 small businesses to obtain financial assistance in order to retain their workforce;

    b. By pilfering PPP funds, the defendant's criminal conduct also harmed American workers whose paychecks the program intended to subsidize;

    c. By submitting 16 fraudulent PPP applications to financial institutions, including Bank A, the defendant raised administrative costs for these financial institutions, likely to delaying the approval of legitimate applications of businesses and other entities that desperately needed a loan to keep their workers employed;

    d. By submitting fraudulent UI claims, the defendant stole opportunities from unemployed people who were actually unemployed during the pandemic and in need of some form of income; and

    e. While the SBA and SWAs are the ostensible victims in this case, the defendant ultimately defrauded the American taxpayers whose earnings underwrite the PPP and UI benefits authorized by the CARES Act.

The circumstances surrounding Rosenberg's criminal conduct are particularly troubling as he used a national tragedy to enrich himself through fraud. The Court should give great weight to this factor in imposing its sentence. *See Gall*, 522 U.S. at 59 (holding it was "quite reasonabl[e]" for the sentencing for the sentencing court to have "attached great weight" to a 3553(a) factor.); *see also Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (holding that appellate court should not find the sentencing court's reliance on a single factor unreasonable, so long as the court imposes a sentence sufficient, but not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)(2)") (internal quotation marks omitted); *see also United States v. Pauley*, 511 F.3d 468, 476 (4th Cir. 2007) (permitting a district court to "reasonably accord significant weight to a single sentencing factor in fashioning its sentence.")

A sentence of 63 months would account for the seriousness of the defendant's crimes,

provide just punishment and would promote respect for the law.

### B. The Defendant's History and Characteristics and the Need for Specific Deterrence

The defendant differs from many others that come before this Court. This defendant is educated, has benefited from several advantageous career opportunities, and is involved with local D.C. politics. These traits highlight the fact that there was no need for the defendant to commit this crime—instead pure greed drove the defendant's actions. As the PSR notes, "the defendant earns a generous income, and bank records reflect significant spending outside of normal living expenses," PSR ¶ 124, to include $1,800 in spending on "beard care products," PSR ¶ 121, as well as luxury vehicle purchases, *see* PSR ¶ 113.

In addition to greed, the defendant appears to rely on lying and deceit to get ahead. For years, the defendant has lied about his education. The defendant claimed to have graduated from the University of Iowa. PSR ¶ 99–101. But that is a lie. His diploma is fraudulent. PSR ¶ 101. And when confronted by the Probation Office multiple times, he continued to lie. PSR ¶ 103. The defendant used the fraudulent University of Iowa diploma to fraudulently obtain admission to Hult International Business School. PSR ¶ 99, 102.

Other statements provided by the defendant since his plea also indicate a lack of candor. For example, the defendant told the Probation Office that he does not have a vehicle and instated used public transportation and ride sharing services. PSR ¶ 113. But the defendant's bank accounts show purchases from companies consistent with care ownership, such as Epic Auto Sales, BP, Auto Zone, and Safelight Autoglass. PSR ¶ 114. The defendant's bank accounts to do not show any ride share purchases to support his claims. PSR ¶ 113. The defendant also claimed not to have PayPal account, despite receiving a PayPal debit in April 2024. PSR ¶ 120.

This Court should impose a sentence that specifically deters both the defendant's greed and penchant for deceit.

## C. Need to Deter Future Criminal Conduct and Promote Respect for the Law

The defendant exploited governmental efforts to aid those in need, for his own financial gain. His actions are serious, and their impact extends beyond this case. Each time federal benefits are obtained through fraud it misappropriates taxpayer dollars and shakes public confidence in government. Rosenberg's conduct demonstrates a disregard for the law and a failure to appreciate the purpose of pandemic relief loans.

Due to the prevalence of government program fraud, the United States often lacks the resources to investigate and prosecute all bad actors. Accordingly, general deterrence is critically important to dissuading others from engaging in similar conduct. *See United States v. Morgan*, 635 F. App'x. 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized.").

Congress recognized that general deterrence is particularly important in the context of white-collar crime and "emphasized the critical deterrent value of imprisoning serious white collar criminals, even when the criminals might be unlikely to commit another offense." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018); *see also United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) (cleaned up) ("[I]n enacting § 3553, Congress was especially concerned that prior to the Sentencing Guidelines, major white collar criminal often were sentence to small fines and little or no imprisonment.")

Pandemic relief loan frauds are deliberate and calculated crimes of choice. They are

therefore more susceptible to general deterrence and more in need of a significant sentence to achieve that deterrence. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (internal citation omitted). Moreover, crimes like this are lucrative and can be difficult to detect. *See*, *e.g.*, *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offense that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.")

A sentence of incarceration of 63 months is, therefore, necessary to send the appropriate message to the defendant—and more importantly, to others—that those who engage in this conduct will be held accountable. And this type of fraud appears to have been rampant: as much as $136 Billion in PPP funds were stolen by people like Rosenberg and his coconspirators.[4] This Court should impose a sentence to deter the defendant and others from repeating similar crimes.

**D. Avoid Unwarranted Sentencing Disparities**

A 63-month Guidelines sentence is best calculated to avoid unwarranted sentencing disparities. As the Seventh Circuit has noted, "[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) (noting light sentence for cooperating defendant was appropriate and lengthy sentence for defendant who did not was

---

[4] "Government Watchdog Estimates U.S. Lost $200 billion to COVID Fraud," by Erin Doherty, Axios, available at https://www.axios.com/2023/06/27/covid-relief-fraud-inspector-general-sba (last visited August 17, 2023) (quoting the Small Business Administration's Office of Inspector General's report.).

appropriate, and was not a disparity, but a justifiable difference).

In March of 2024, this Court sentenced Rosenberg's co-conspirator, Ouedraogo, to 36 months imprisonment. *See U.S. v. Ouedraogo*, 1:23-cr-183, ECF No. 21. A 63-month sentence for Rosenberg is warranted for three reasons. First, Ouedraogo personally obtained $384,700 from the PPP loan fraud scheme. By contrast, Rosenberg personally profited $1.6 million (over four times more than Ouedraogo for the same fraud scheme). Rosenberg's sentence should account for the additional fraud proceeds Rosenberg received. Second, in addition to engaging in PPP loan fraud, Rosenberg simultaneously engaged in over $110,000 of UI fraud. Rosenberg's sentence should also consider his other attempted and completed frauds. And third, unlike Ouedraogo, Rosenberg continues to demonstrate a lack of candor and credibility after being confronted with him crimes and his lies. For those reasons Rosenberg is more culpable than Ouedraogo, and Rosenberg's sentence should reflect that fact.

## IV.  CONCLUSION

A sentence of 63 months imprisonment is sufficient but not greater than necessary to account for the defendant's wrongdoing. Such a sentence is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Jessica D. Aber
United States Attorney

_____
Zachary H. Ray
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 26, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to all counsel of record.

By:
      Zachary H. Ray
      Assistant United States Attorney
      United States Attorney's Office
      Justin W. Williams U.S. Attorney's Building
      2100 Jamieson Avenue
      Alexandria, VA 22314
      Telephone: 703-299-3700
      Email: zachary.ray@usdoj.gov